(No. 12911.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS KOHN, Plaintiff in Error.

*Opinion filed December 17, 1919.*

1. CRIMINAL LAW—*what necessary to sustain a conviction for receiving stolen property.* To sustain a conviction for receiving stolen property described in the indictment, it must be shown that the defendant knew when he received it that such property was stolen; and while proof of actual or direct knowledge is not required, yet facts and circumstances must be proved sufficient to create in the mind of the accused a belief that the property was stolen.

2. SAME—*when property other than that described in indictment is not admissible.* On the trial of a person charged with receiving certain stolen property specifically described in the indictment, other property turned over by the defendant to the police but which is not described in the indictment or shown to have been stolen property cannot be introduced in evidence, and should not be permitted to be on exhibition during the trial or be made the subject of comment in the argument of the prosecuting attorney for the purpose of prejudicing the defendant in the minds of the jury.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ROBERT E. CROWE, Judge, presiding.

GEORGE W. McGURN, MAURICE I. GREEN, and FREDERICK A. BROWN, (L. B. MELNICK, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, ALBERT D. RODENBERG, EDWARD E. WILSON, and JOHN K. MURPHY, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Louis Kohn, with others, was indicted in Cook county for receiving stolen property for his own gain and to prevent the owner from again possessing his property. The property described in the indictment was one chain of the value of $400, one watch of the value of $600, one pendant

of the value of $150, one pair of cuff buttons of the value of $150, two studs of the value of $500 each, one ring of the value of $250, one watch of the value of $125 and one chain of the value of $50, the personal property and goods of George M. Reynolds. The Reynolds residence was burglarized and the property described in the indictment stolen therefrom. The watch and platinum chain were the only jewelry stolen from the Reynolds residence which was found in the possession of defendant. He was engaged in the jewelry and watch business in the Heyworth building, in the city of Chicago. The burglary of the Reynolds residence occurred the night of January 5, 1917. The watch was an expensive make, shown by the proof to be worth $600. On the back of the case it had the initials G. M. R. The platinum chain, according to the proof, was worth $500.

Harry W. Jones testified he was an investigator for the bank of which George M. Reynolds was president and after the burglary of the Reynolds residence he was requested to make an investigation. He testified he located the watch January 18, 1917, at the place of business of the Art Watch Case Company; that on the same day, two hours later, he had a talk with defendant in his place of business; that police officer DeMar was with him at the time. Witness asked defendant if he had in his possession a watch of the make of Reynolds' watch, which he had sent out to have the initials G. M. R. removed, and defendant said no. Witness told him he had information that defendant had the watch. Defendant replied his information was wrong. Witness left defendant's place of business about ten minutes, and when he returned told defendant he had located the watch with the Art Watch Case Company. Defendant said, "It is there all right," and went with witness and policeman DeMar to the Art Watch Case Company, where a man turned over to defendant two watch cases, one of them the Reynolds watch. In reply to a question by De-Mar defendant said that was all he had. DeMar asked him

where he got the cases, and he said a man brought them to him; that he had met the man two or three weeks before at a party but did not know his name; that the man kept a pawnshop on Clark street, near Division. DeMar asked him if he knew him by the name of Red Fries, and he said maybe that was his name. Defendant went to his safe, got two watch movements and put them in the cases. DeMar took the defendant to the Hudson avenue police station and witness accompanied them. At the station DeMar asked defendant if he could get the name of the person he got the property from, and defendant called somebody up on the telephone. The next morning about ten o'clock witness and DeMar went to defendant's place of business and he then turned over a watch and some diamonds and said that was all the stuff he had. The diamonds were unset. The witness testified the first day he was at defendant's place of business he got the watch and the second day the platinum chain and several other articles of jewelry.

J. E. Silverman testified the residence of his family was burglarized December, 1916, and his watch and his brother's watch stolen. He identified one of the watches received from defendant as his.

George DeMar testified he went with Jones to defendant's place of business and asked him if he repaired watches or if he handled watches that were given to him to have initials taken off. To both questions defendant answered that he did not. Witness asked him if he had a watch (describing the make) with the initials G. M. R. on it, and he said no. Jones then went out, and witness told defendant he had information defendant had been handling jewelry that had been stolen in the "gold coast" burglary, and he said he had not. Jones came back and told defendant he had located the watch and where. Defendant said, "Yes, that is the watch." The three of them then went to the Art Watch Case Company and were told by a man there, named Reickert, defendant had brought in two watches to have the

initials removed. Reickert gave the watches to Kohn in envelopes with Kohn's business printed on them. The initials G. M. R. were on the back of one of them and H. S. S. on the back of the other. Witness asked defendant where he got the watches, and he said a fellow left them there. The three then went back to defendant's place of business and the defendant got the movements out of his safe and put them in the cases. He said he met the man he got them from a short time before at a friend's house; that the man ran a pawnshop on Clark street, near Division, and he thought his name was Julius Friedlander. Witness took defendant to the police station and on the way he told defendant he was in a bad fix; that the papers were full of the gold coast burglary and contained a description of the watch. He asked the defendant why he did not notify the police when Friedlander brought him the watch with the initials G. M. R. on it. Defendant said he was no policeman. At the station the police officer in charge asked the defendant if he had some more stuff, and he replied he had another watch and some unset stones. When asked where Friedlander was defendant said he did not know but would call up a friend and get his number. He called up someone and gave Friedlander's address. Defendant said if they would let him go he would meet them at his office the next morning. The next morning witness and Jones went to defendant's office. He gave them another watch and some unset diamonds and said that was all he got from Friedlander. Defendant appears to have been taken back to the police station, and the witness testified he brought Friedlander into his presence. Friedlander told defendant to turn over all the jewelry he got from him; that he had told the police all. Witness told defendant that Friedlander said he (defendant) had two small bar pins, a large diamond-set bar pin, a coral pendant, a pearl platinum chain, a gold pencil and a diamond lavalliere pendant. Policeman Cullen, Jones and defendant went out and came back in the afternoon

with the bar pins, lavalliere, gold pencil, some diamonds, a platinum chain and another watch. Defendant said he paid Friedlander for jewelry in checks. There were two packages of five diamonds each and one of fifteen diamonds. Defendant said some of them were his and some he got from Friedlander.

Policeman Cullen testified he went with defendant on January 19 to certain jewelry houses; that defendant said he would take him there to get some jewelry; that defendant got the lavalliere, two bar pins and two watches, which he turned over to the witness; that he also got a piece of coral and some diamonds in an envelope. The witness turned all the jewelry over to the officer in charge at the police station and it was exhibited at the trial.

On behalf of the defense Ernest Mueller, police lieutenant in charge of the Hudson avenue station, testified he had a conversation with defendant when he was first brought to the station about where he got the jewelry. He said that he got it from Friedlander, who had often left jewelry with him to be repaired, and said he had more property which he got from Friedlander and that he would come down the next morning to return the other property; that he came down the next morning for the purpose of going down to his place of business and getting more property he had received from Friedlander; that witness sent policeman Cullen with him to take possession of the property.

Herman Kohn, brother of defendant, who stayed in his place of business, testified he was present when the conversation occurred there, testified to by Jones and DeMar; that DeMar asked defendant if he had a certain watch that rings and he said he had not; that he had a watch in for repair that was at the case maker's, and if they wanted to see it he would go down and show it to them; that they left and returned in a few minutes, and one of them asked defendant if he had the address of the man who left the watch which they had brought in; that he said he would get it as

soon as he put the movement in the case; that he looked up in his files the address of Friedlander and gave it to them; that when he did so DeMar called up someone on the telephone and told him to get Friedlander at the address he gave them.

Defendant in his own behalf testified that when Jones and DeMar came to his place of business January 18 and asked if he had a watch of a certain make, describing the Reynolds watch, he told them he was not sure; that he thought he had one something like it at the case maker's for repairs, which was left by somebody, and if they wanted to he would go with them to look at it to see if it was what they were looking for. They went to the case maker's and got the case and DeMar said it was the watch they were looking for, and defendant took it to his place of business, put the works in it and gave it to DeMar. DeMar asked witness who left it with him, and defendant told him it was Julius Friedlander and gave his address, saying he conducted or had conducted a pawnshop on Division and Clark streets. DeMar called up someone by telephone, gave them the address of Friedlander and told them to go and get him. DeMar then took defendant to the police station. DeMar did not say to defendant he was in a bad fix and that he should have known about the gold coast burglary from the newspapers. He testified that at the police station he told officer Mueller he got the watch from Friedlander; that he thought there were more things he bought from Friedlander on consignment, and that he would come down the next morning and show the officer whatever he could find; that next morning at ten o'clock DeMar and Jones came to his place of business and he handed them a few things he had bought from Friedlander, and there were a few other articles he had sold or given out on consignment to other people; that he would go with them and look them up if they wanted him to. Policeman Cullent went with him and he got back the Reynolds chain and the other jewelry men-

tioned by Cullen in his testimony. They also went to the bank and defendant got the canceled checks he had given Friedlander and turned them over to the police. Defend-. ant testified he was never confronted with Friedlander at the police station, and Friedlander never said to him he might as well turn over all the jewelry he (defendant) got from him. He never tried at any time to conceal the property which he turned over to the police. He testified he knew Friedlander as a dealer in diamonds and jewelry and had purchased goods from him for about a year. He tes-' tified he received the watch from Friedlander January 15 and at the same time received another watch known as the Silverman watch; that both were left with him to get an estimate of the cost of removing the initials on them, and that he took them to the Art Watch Case Company for that purpose and was told they would give him an estimate the next time he came in.

Fred Reickert, of the Art Watch Case Company, corroborated the statement that the watches were brought for the purpose of getting an estimate of the cost of removing the initials and that he communicated with Spaulding & Co. for that information.

James M. Becker testified he had been in the jewelry business practically all his life, and that it was a frequent thing for him to remove initials from watches.

Ten witnesses, including merchants, professional men and clerks, testified to the good reputation of defendant as a law-abiding citizen, prior to his indictment.

The errors argued in the briefs are, that the court improperly admitted evidence with reference to the Silverman watches and the other jewelry which were no part of the property described in the indictment as having been stolen from the Reynolds house; that the opening statement and closing argument of the State's attorney were improper, erroneous, prejudicial and tended to inflame the passions of the jury; that the court erred in refusing two instructions

and modifying one asked by plaintiff in error, and that the
evidence was insufficient to warrant the verdict of guilty.
Plaintiff in error objected to the testimony of Silver-
man about the burglary of his house in December and the
larceny therefrom of two watches, one of which was his
and was found in the possession of plaintiff in error and
identified by the witness at the trial. At the conclusion of
Silverman's testimony plaintiff in error moved to strike it
out, but the motion was denied. Plaintiff in error also ob-
jected to the exhibition of and testimony about other jew-
elry than that described in the indictment as stolen from
the Reynolds residence. We do not understand from the
testimony that there was any proof made that any of the
jewelry except the Reynolds watch and chain and the Silver-
man watch was stolen property. It was obtained from the
plaintiff in error and he received it from Friedlander. Some
portions of the testimony of witnesses relating to other than
the Reynolds jewelry were struck out by the court as the
testimony progressed and the jury instructed to disregard it.
The prosecution also offered to introduce in evidence the
two Silverman watches and other jewelry than that stolen
from the Reynolds residence, to which plaintiff in error ob-
jected. The court announced he would pass on that later.
After a lengthy discussion between court and counsel the
prosecution withdrew the offer in evidence of any jewelry
except the Reynolds watch and chain. At the conclusion of
all the evidence the court announced that the objection to
"what was referred to as the Silverman watches is sustained
and they will be excluded from evidence," and the jury were
instructed to disregard that testimony. The State's attor-
ney in his opening statement to the jury said that he would
prove that in addition to the Reynolds burglary the police
investigated the burglary of a house on Astor street and
the Silverman home. On objection by counsel for defend-
ant the court suggested that the State's attorney had at that
time better not go into that. In his closing argument the

290 — 27

State's attorney said that in addition to the Reynolds watch and chain found in plaintiff in error's possession there was found the other jewelry, the proceeds of burglary; that when the officer caught him red-handed with the goods the plaintiff in error turned over another stolen watch at the same time. The State's attorney's closing argument was in part based on the theory that stolen jewelry other than the Reynolds watch and chain was in the possession of plaintiff in error and he was a "fence" for burglars and thieves. He charged that defendant's place of business was a place for thieves to meet, receive and dispose of stolen property. He said in his argument that while our boys were called to the colors, defendant, twenty-nine years of age, was dealing with Red Fries. This was unfair, for the reason that defendant had no opportunity to explain or give any excuse, if he had any, why he was not in the army. Objections were sustained to parts of that line of argument. Except the Reynolds watch and chain and Silverman watch there was no proof that any of the jewelry turned over to the police by plaintiff in error was stolen property, but testimony concerning the same was evidently permitted upon the ground that it was stolen property, and it plainly was so regarded and treated by the police and State's attorney and was well calculated to so impress the jury. We can see no possible legitimate theory on which the State's attorney should exhibit it at the trial and seek to offer it in evidence. It was not received in evidence, and the court at the close of all the evidence excluded "what was referred to as the Silverman watches" and announced "they" were excluded from the evidence.

Plaintiff in error was tried for the specific crime of receiving for his own gain, and to prevent the owner from again possessing it, certain property described, belonging to George M. Reynolds. To sustain a conviction on such a charge it is necessary to prove the accused knew the goods had been stolen when he received them. Proof of actual

or direct knowledge is not required, but facts and circumstances must be proved sufficient to create in the mind of the accused a belief that the goods were stolen. (*Cohn.*v. *People,* 197 Ill. 482; *People* v. *Israel,* 240 id. 375.). It was held in *Lipsey* v. *People,* 227 Ill. 364, that as tending to show guilty knowledge it is competent, within certain rules, to show the accused had on former occasions received property through the same channels, but the property received must have been stolen property. Here much of the property exhibited at the trial and offered to be introduced in evidence and testified about by the witnesses as having been turned over to the police by plaintiff in error was not even shown to have been stolen property. The general rule is that in a criminal prosecution of one on a specific charge it is not competent to admit evidence of his commission of another and distinct offense. (*Farris* v. *People,* 129 Ill. 521.) But there is an exception to that rule in certain cases, where guilty knowledge or a particular intention is necessary to be proved to establish the offense charged. Where the evidence tends to prove the charge in the indictment, the mere fact that it may also tend to prove another crime does not make it incompetent, but if it only tends to prove the accused committed another crime and it is therefore probable he committed the crime charged in the indictment the evidence is inadmissible. *Williams* v. *People,* 166 Ill. 132.

We cannot escape the conviction that in view of the character of some of the evidence and statements and argument of the State's attorney plaintiff in error did not have a fair trial on the charge in the indictment, and this was not cured by the court's ruling in striking out some of the evidence. We express no opinion on the sufficiency of the competent evidence further than to say we do not think this case is in the class of cases where the proof of guilt is so conclusive that the errors do not justify a reversal.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*